ROBERT J. DAVIS, *Appellant,* v. GLENN DIXON, GEORGE E. MILLER, and C. L. BROWN, as Members of the Board of Public Instruction of Broward County, Florida; *Appellees.*

Division B.

Opinion filed June 25, 1929.

Petition for rehearing denied July 30, 1929.

*Everette H. Hunt,* for Appellant;

*Giles J. Patterson,* for Appellees.

STRUM, J.—By authority of Section 17 of Article 12 of the Constitution as amended in 1924, and pursuant to an election of the freeholders of the district, as required by that section of the Constitution, Special Tax School District Number 3 of Broward County, acting through the Board of Public Instruction of said county, issued bonds for the exclusive use of public free schools in said district in the principal sum of $500,000, dated October 1, 1926, bearing interest at the rate of six per cent per annum, and maturing annually in amounts not less than three per cent of the total amount of said issue, from October 1, 1929, to October 1, 1955, both inclusive. (See Sects. 720 et seq., Comp. Gen. Laws 1927; Sec. 579 et seq., Rev. Gen. Stats. 1920, as amended.)

On September 25, 1928, the Board of Public Instruction of Broward County, acting for the district, passed a resolution reciting, amongst other things, that "$15,000 interest coupons on said issue (the issue above described) will become due within three months of the passage of this resolution and can not be paid at maturity from authorized revenue, and that it is necessary that said amount of interest on bonds of said issue be refunded." It was there-

upon resolved by said Board of Public Instruction "that bonds of said district be issued in the amount of $15,000 for the purpose of refunding said interest on bonds to become due as aforesaid." The proposed refunding bonds were to consist of thirty bonds, each in the principal sum of $500, dated October 1, 1928, bearing interest at the rate of six per cent per annum, payable semi-annually, and maturing, one bond each year from October 1, 1931, to October 1, 1940, and two bonds each year from October 1, 1941, to October 1, 1950, inclusive. In proposing to issue said refunding bonds the board purported to act by authority of Chap. 11855, Acts of 1927, purporting to authorize the issuance of refunding bonds by counties, cities, towns and other municipal corporations and taxing districts, which Act does not require an election of the freeholders, or otherwise, as a prerequisite to the issuance of such refunding bonds. It is proposed by the Board of Public Instruction to issue the refunding bonds in question without submitting the matter to an election of the freeholders of the school district involved.

As a taxpayer upon real property located in said district, appellant exhibited his bill of complaint prior to the issuance of the proposed refunding bonds for the purpose of restraining their issue. A demurrer was sustained and the bill of complaint dismissed, from which order this appeal is taken.

The sole question presented for decision is whether or not a Board of Public Instruction, acting for a Special Tax School District pursuant to Chap. 11855, *supra,* may issue bonds to be exchanged or sold for the purpose of refunding outstanding bonds of a Special Tax School District originally issued by authority of Section 17 of Article 12 of the Constitution and pursuant to an election of the freeholders of the district as therein required, without submitting the

question of the issuance of the refunding bonds to an election of the freeholders of such Special Tax School District.

Section 17 of Article 12 of the Constitution, as amended in 1924, provides as follows:

"Section 17. The Legislature may provide for special tax school districts to issue bonds for the exclusive use of public free schools within any such special tax school district, whenever a majority of the qualified electors thereof who are freeholders shall vote in favor of the issuance of such bonds, but no bonds shall be issued hereunder which shall exceed, together with the existing indebtedness of such special tax school district 20 per cent of the assessed value of the taxable property of such district according to the last assessment for State and county purposes prior to the issuing of such bonds. Any bonds issued hereunder shall become payable within thirty years from the date of issuance in annual instalments which shall commence not more than three years after the date of issue. Each annual instalment shall be not less than three percent of the total amount of the issue. * * *"

The remainder of the section provides for the levy of a special tax on the taxable property within the district for the payment of such bonds, and further provides that such tax shall not be applied to any other purpose.

We are aware of the well nigh universal general rule that even where a constitutional provision requires a vote of the electors to originally authorize the incurring of an indebtedness, or the original issuance of bonds, no such election is necessary to the issuance of refunding bonds pursuant to statute for the purpose of discharging outstanding bonds originally issued in accordance with the constitutional requirement, so long as the refunding bonds create

no additional or increased liability on the part of the obligor, unless, of course, the statutory or other authority under which the refunding bonds are issued requires a resubmission to the electorate. The theory of the case so holding is that since the bonds are not the debt itself, but the legal evidence of the existence of the debt, the issuance of refunding bonds for the purpose of discharging an existing legal indebtedness, originally incurred in accordance with the constitutional requirement, does not create a new debt or impose any new liability against the taxpayers or their property within the meaning of such constitutional provision, but merely renews and continues in a changed form the original existing indebtedness which was originally created in conformity with the Constitution, and that such constitutional provision therefore does not prohibit the renewal, without a vote, of the previously existing valid debt, so long as no additional or increased liability is created. The fact that interest must be paid upon the refunding bonds during the additional renewal period would not impose an additional or increased liability as contemplated by that rule because if the original bonds were allowed to rest in default they would continue to draw interest. The result, therefore, would be the same in dollars and cents, except in cases where the legal rate is higher than the contract rate on the bonds and in certain States where the rule prevails that bonds in default shall draw interest during the period of default at the legal rate and not the contract rate. Under those circumstances it would be more expensive to permit the bonds to rest in default than to refund them, and such additional expense would be prevented by the issuance of refunding bonds. Veatch v. City of Moscow, et al, 18 Idaho 313, 109 Pac. R. 722, 21 Ann. Cas. 1332; Blanton v. Board of County Com'rs (N. C.), 8 So. E. R. 162; McCless v. Meekins (N. C.), 23 So.

E. R. 99; McCreight v. Zemp (S. C.), 26 So. E. R. 984; Gaulbert v. City of Louisville (Ky.), 97 So. W. R. 342; Culbertson v. City of Louisville (Ky.), 128 So. W. R. 292; Geer v. Board of Com're, 97 Fed. R. 435; Hickey v. Nampa (Ida.), 124 Pac. R. 280; State v. Weinrich (Mo.), 236 So. W. R. 72; Board of Com'rs v. Aetna Ins. Co., 90 Fed. R. 222; Board of Com'rs v. National Life Ins. Co., 90 Fed. R. 228; Board of Com'rs v. Society for Savings, 90 Fed. R. 233; City of Pierre v. Dunscombe, 106 Fed R. 611, 617; Rollins & Long v. County Com'rs, 80 Fed. R. 692; Hughes Co. v. Livingston, 104 Fed. R. 306; State ex rel. v. Neosho, 101 So. W. R. 99; City of Los Angeles v. Teed, 44 Pac. R. 580; Miller v. School District, 39 Pac. R. 879; City of Huron v. Second Ward Savings Bank, 86 Fed. R. 272; Parker v. City of Butte, 193 Pac. R. 748; Board of Com'rs v. Travelers Ins. Co., 128 Fed. R. 817; Abbott on Public Securities, p. 420. Compare Doon Twp. v. Cummins, 142 U. S. 366, 35 L. Ed. 1044; and Montpelier Sav. Bank v. School Dist., 92 N. W. R. 439.

But none of the constitutional provisions under consideration in the cases just above cited contained limitations, such as are found in our Constitution, with reference to the maturity of the bonds there under consideration. The constitutional provisions considered in those cases had reference only to the contracting of debts and the limitation of indebtedness. The question considered in those cases therefore was whether or not, the obligation having been originally created pursuant to an election as required by those Constitutions, a further election was essential to the issuance of refunding bonds which merely extend the time of maturity and which neither create any new obligation nor increase the existing valid indebtedness already sanctioned by the electors. It was held that such an election was unnecessary under those circumstances.

In view, however, of the additional and explicit requirements of our Constitution as to the serial maturity of bonds of the character under consideration, the question presented by this appeal can not be disposed of upon the general rule as to refunding bonds hereinabove alluded. to. Our Constitution not only requires a vote of the freeholders upon the question of the original creation of indebtedness by the issuance of Special Tax School District bonds, but it expressly requires serial maturities of the bonds at stated intervals and in stated percentages of the total amount of the issue. We must therefore, consider not only whether those proposed bonds are merely a renewal in amount of the existing indebtedness already sanctioned by the electors of the district, but also whether or not the maturities of the proposed refunding bonds would conform to the express limitation of our Constitution.

As originally adopted in 1912 this section of the Constitution merely provided as follows with reference to the issuance of such bonds:

"Section 17. The Legislature may provide for special tax school districts, to issue bonds for the exclusive use of public free schools within all such special tax school districts, whenever a majority of the qualified electors thereof, who are freeholders, shall vote in favor of the issuance of such bonds."

There follows a provision with reference to the levy of a special tax to retire such bonds.

By the amendment of 1924 the limitation was added that such bonds should not exceed twenty per cent of the assessed value of the taxable property of such district, as well as the further limitation that "any bonds issued hereunder shall become payable within thirty years from the date of issuance in annual installments which shall com-

mence not more than three years after the date of issuance. Each annual installment shall be not less than three per cent of the total amount of the issue.''

There was an obvious purpose in the adoption of our 1924 amendment. The purpose was not only to prevent the creation or increase of bonded indebtedness by Special Tax School Districts, unless a majority of the freeholders should approve thereof, but also to require that such indebtedness, when contracted, should be discharged within fixed periods and according to a prescribed ratio of serial payments. To that end, the amendment of 1924 provided that the bonds which evidence such indebtedness should become payable serially in the ratio therein prescribed, so that such indebtedness should be paid within the time fixed.

It is true that the only question required to be submitted to the freeholders by the *Constitution itself* is whether or not the bonds shall issue, that is, whether or not the indebtedness to be evidenced by the bonds shall be incurred. The Constitution itself does not require that the matter of maturities shall be submitted to the freeholders, but it does in terms expressly confine the maturities to prescribed limits. It is required by statute, Sec. 721, et seq., Comp. Gen. Laws 1927, that the question of maturities be submitted to the freeholders. That requirement may therefore be modified by statute. But even though it be competent for a statute to authorize a modification of maturities by the issuance of refunding bonds without re-submitting the matter to the electorate, such maturities must nevertheless conform to the superior constitutional limitation. Weinberger v. Board of Pub. Inst., 112 So. R. 253.

It may be, and probably is the case, although it is unnecessary to now decide the point, that if it is found impossible to pay the original bonds at maturity, new bonds might be issued with which to discharge the original in-

debtedness by pursuing, *ab initio,* the entire procedure provided for the original issuance of such bonds, including a submission of the matter to the electorate.  Such new bonds might serve substantially the same purpose as refunding bonds, but in its essential nature the indebtedness thereby evidenced would necessarily be a new indebtedness because the postulate of the general rule as to the issuance of refunding bonds without a new election is that such refunding bonds merely evidence an extension or renewal in a new form of the original existing indebtedness, and our Constitution itself forbids such a continuation of indebtedness of this nature by limiting the time within which the bonds by which it is evidenced shall become payable.

The insuperable command of the Constitution is that these bonds ''shall become payable within thirty years from the date of issuance in annual instalments which shall commence not more.than three years after the date of issuance.  Each annual instalment shall be not less than three per cent of the total amount of the issue.''  That plan of maturity is therefore mandatory and exclusive. In providing for the issuance of such bonds, it was necessarily contemplated that bonds would be issued in the usual commercial form, with interest payable according to the usual custom in such cases, which is usually (but, of course, not always) semi-annually.  The Constitution prescribes not only the minimum maturities as to amounts, but further prescribes that the maturities, in whatever amounts they are fixed, shall commence ''not more than three years after the date of issuance,'' the purpose being that such amounts should be paid at that time.  The language just above quoted as to maturities refers primarily to principal. It was no more contemplated by the Constitution, however, that payment of the interest which is provided for in the face of the bonds and is an integral part of the indebted-

ness, could be deferred so as to commence more than three years after date of issuance, than that payment of the principal could be so deferred.

The date of issuance of the existing bonds was October 1, 1926. It is proposed by issuing refunding bonds to defer payment of the interest accruing on the original bonds during the period from April 1, 1928, to October 1, 1928, aggregating $15,000, so that payment of the same will not commence until October 1, 1931, the date of the maturity of the first proposed refunding bonds, which is five years after the date of original issue. It would have been a clear violation of the Constitution to have made the interest mature in that manner originally. To permit that result to be accomplished by issuing the proposed refunding bonds would clearly defer payment of the interest in question so that payment thereof would commence beyond the time limited by the Constitution, and would enable the obligor district to accomplish by indirection what the Constitution commands that it shall not do directly.

The views here expressed do not conflict with State v. Walker, 92 So. W. R. 69; State v. Hackman, 199 So. W. R. 990; nor Kane v. Charleston, 43 N. E. R. 611. The constitutional provisions under consideration in those cases differ materially in purpose and effect from those of the Florida Constitution here under consideration. The constitutional provision in State v. Walker and State v. Hackmann provided that: ''No * * * school district, or other political corporation or subdivision of the State, shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose * * *; and any * * * school district, or other political corporation or subdivision of the State, in-

curring any indebtedness requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for payment of the principal thereof, within twenty years from the time of contracting the same.'' The constitutional provision considered in Kane v. Charleston, *supra,* required the municipal authorities to provide for the collection of a tax sufficient to pay the interest on bonds issued, ''and also to pay and discharge the principal thereof within twenty years from the time of contracting the same.''

The purpose and intent of the constitutional requirements just quoted was to provide a sinking fund. They were not intended as a limitation upon the maturities of the bonds. In construing those constitutional provisions, the courts of those States very properly held in effect that the dominating thought in the minds of the framers of those constitutional provisions was to surround certain municipalities and other subdivisions of the State with Constitutional restrictions upon the subject of *incurring* indebtedness, and that those constitutional provisions were aimed at the *creation* of debts and for the raising of a sinking fund sufficient to discharge the same, rather than at the time within which such debts should be paid. It is pointed out in those cases as significant that the framers of those Constitutions failed to give any expression in the provisions of that instrument under consideration prohibiting either an extension of the time of payment or appropriate legislation to meet such conditions. These considerations led to the construction in those cases that those constitutional inhibitions extended only to the creation of the indebtedness and to the providing of a sinking fund for its discharge, and did not create a limitation upon the time of maturities.

But the Florida Constitution goes further than either of the constitutional provisions just discussed. Our Constitution, besides requiring the submission to the voters of the question of incurring the debt, further specifically requires the levy of a special tax to provide a sinking fund for payment of the bonds at maturity. So much was required by our Constitution as it stood prior to the amendment of 1924. But by that amendment a further provision was added, in specific and self-executing language, expressly limiting the maturities of such bonds as to both time and amount. The latter provision of our Constitution clearly distinguishes this case from those last above discussed, and necessitates the conclusion we here reach.

The order sustaining the demurrer is reversed, and the cause is remanded with directions to overrule the demurrer, and for further proceedings consistent with this opinion.

WHITFIELD, P. J., and BUFORD, J., concur.

TERRELL, C. J., AND ELLIS AND BROWN, J. J., concur in the opinion and judgment.